UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHIGAN ASSOCIATION OF NON-
PUBLIC SCHOOLS, ET AL.,

      Plaintiffs,

v

ROBERT GORDON, in his official
capacity as Director of the Michigan
Department of Health and Human
Services,

      Defendant.

_____

No. 1:20-cv-01174

HON. PAUL L. MALONEY

MAG. JUDGE GREEN

Thomas J. Rheaume Jr. (P74422)
Gordon J. Kangas (P80773)
Bodman, PLC
Attorneys for Plaintiffs
6th Floor at Ford Field
1901 St. Antoine Street
Detroit, Michigan 48226
313-259-7777
trheaume@bodmanlaw.com
gkangas@bodmanlawcom

Daniel J. Ping (P81482)
Neil Giovanatti (P82305)
Kyla L. Barranco (P81082)
Assistant Attorneys General
Attorneys for Defendant
P.O. Box 30736
Lansing, MI 48909
517-335-7632
pingd@michigan.gov
giovanattin@michigan.gov
barrancok@michigan.gov

_____/

**DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFFS'
MOTION FOR TEMPORARY RESTRAINING ORDER**

# TABLE OF CONTENTS

Page

Table of Contents ......................................................................................... i

Index of Authorities ................................................................................... iii

Concise Statement of Issues Presented ..................................................... vi

Controlling or Most Appropriate Authority ............................................. vi

Introduction ................................................................................................. 1

Statement of Facts ....................................................................................... 4

    A.    The nature of the COVID-19 pandemic .................................... 4

    B.    The State of Michigan's response to the COVID-19 pandemic .............. 8

    C.    Plaintiffs' Complaint and Motion for Temporary Restraining Order and Preliminary Injunction ......................................... 11

Standard of Review .................................................................................... 13

Argument .................................................................................................... 14

I.    Plaintiffs are not likely to succeed on the merits of their claims .................. 14

    A.    Plaintiffs have not pled a viable claim under the First Amendment's Free Exercise Clause. ..................................... 14

        1.    The Order does not violate Plaintiffs' free exercise rights ......... 15

        2.    The fact that other, different activities are regulated differently does not render the in-person learning restrictions unconstitutional. ...................................... 16

        3.    Plaintiffs' incomplete allegations of voluntary mitigation measures are immaterial. ......................................... 27

    B.    Plaintiffs have not pled a viable claim under the Fourteenth Amendment. ......................................................... 29

    C.    *Jacobson* further prevents Plaintiffs from establishing a strong likelihood of success on the merits. ..................................... 32

II.    Plaintiffs make an inadequate showing of irreparable harm. ....................... 35

III.    The remaining factors weigh in favor of Director Gordon ............................. 37

Conclusion and Relief Requested ..................................................................... 40

Certificate of Compliance with Local Civil Rule 7.2(b)(i) ........................................... 41

Certificate of Service ........................................................................................ 42

# INDEX OF AUTHORITIES

Page

## Cases

*Albright v. Oliver,*
510 U.S. 266 (1994) ...................................................................... v, 30

*Armour v. City of Indianapolis,*
566 U.S. 673 (2012) ......................................................................... 33

*Bays v. City of Fairborn,*
668 F.3d 814 (6th Cir. 2012) ........................................................... 13

*Bell v. Johnson,*
308 F.3d 594 (6th Cir. 2002) ........................................................... 30

*Bowen v. Roy,*
476 U.S. 693 (1986) ......................................................................... 15

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993) ................................................................. passim

*Commonwealth ex rel. Danville Christian Academy v. Beshear,*
No. 20-6341 (6th Cir. Nov. 29, 2020) ....................................... passim

*Emp't Div., Dep't of Human Resources of Oregon v. Smith,*
494 U.S. 872 (1990) ......................................................................... 15

*Employment Division v. Smith,*
494 U.S. 872 (1990) ......................................................................... 16

*Freeman v. Michigan Dep't of State,*
808 F.2d 1174 (6th Cir. 1987) ......................................................... 11

*Jacobson v. Commonwealth of Massachusetts,*
197 U.S. 11 (1905) ................................................................... passim

*Johnson v. Lyon,*
406 F. Supp. 3d 651 (W.D. Mich. 2018) .......................................... 30

*League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer,*
814 F. App'x 125 (6th Cir. 2020)................................................ 33, 37

*Maryland v. King,*
567 U.S. 1301 (2012) ....................................................................... 37

*Maryville Baptist Church, Inc. v. Beshear,*
957 F.3d 610 (6th Cir. 2020) ............................................................. passim

*McNeilly v. Land,*
684 F.3d 611 (6th Cir. 2012) ................................................................ 13

*McNeilus Truck & Mfg., Inc. v. Ohio ex rel. Montgomery,*
226 F.3d 429 (6th Cir. 2000) ................................................................ 11

*New Doe Child #1 v. Congress of the United States,*
891 F.3d 578 (6th Cir. 2018) ................................................................ 16

*New Motor Vehicle Bd. v. Orrin W. Fox Co.,*
434 U.S. 1345 (1977) ............................................................................ 37

*Pennhurst State Sch. & Hosp. v. Halderman,*
465 U.S. 89 (1984) ................................................................................ 11

*Perez-Perez v. Adducci,*
459 F. Supp. 3d 918 (E.D. Mich. 2020) .............................................. 13

*Prater v. City of Burnside, Kentucky,*
289 F.3d 417 (6th Cir. 2002) ................................................................ 15

*Prince v. Massachusetts,*
321 U.S. 158 (1945) .............................................................................. 32

*Roberts v. Neace,*
958 F.3d 409 (6th Cir. 2020) ......................................................... 19, 25

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
No. 20A87 (U.S. Nov. 25, 2020) ......................................... 2, 25, 26, 34

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
137 S. Ct. 2012 (2017) ................................................................ v, 15, 16

*Tumblebus, Inc. v. Cranmer,*
399 F.3d 754 (6th Cir. 2005) ................................................................ 35

*Ward v. Polite,*
667 F.3d 727 (6th Cir. 2012) ......................................................... passim

*Wisconsin v. Yoder,*
406 U.S. 205 (1972) .................................................................... 30, 31, 32

**Statutes**

Mich. Comp. Laws § 333.2253 ............................................................... 1, 9

Mich. Comp. Laws §§ 333.1101, *et. seq* ........................................................ 8

**Other Authorities**

13 Moore's Federal Practice § 65.22 (Matthew Bender 3d. ed)................................. 38

## CONCISE STATEMENT OF ISSUES PRESENTED

1.      Are Plaintiffs likely to succeed on the merits of their First Amendment claim?

2.      Are Plaintiffs likely to succeed on the merits of their Fourteenth Amendment claim?

3.      In the absence of a preliminary injunction, will Plaintiffs suffer irreparable harm?

4.      Will a preliminary injunction serve the public interest?


## CONTROLLING OR MOST APPROPRIATE AUTHORITY

- *Commonwealth ex rel. Danville Christian Academy v. Beshear*, No. 20-6341, ___ F.3d ___, 2020 WL 7017858 (6th Cir. Nov. 29, 2020)

- *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017)

- *Albright v. Oliver*, 510 U.S. 266 (1994)

- *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993)

- *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905)

# INTRODUCTION

COVID-19 continues to rampage through the State of Michigan. We are in the throes of a second wave, with COVID-19 hospitalizations and deaths skyrocketing and confirmed cases hitting new daily highs on a regular basis. Under our system of ordered liberty, everyone must do their part for the benefit of all. High schools of all stripes are among those who have to shoulder certain burdens. There is no constitutional impediment to regulating schools as schools, particularly in the context of this public health crisis.

As is well-known to this Court, the Michigan Department of Health and Human Services (DHHS) has taken swift and decisive action in an effort to control the pandemic. Plaintiffs challenge a particular provision in his Emergency Order, dated December 7, 2020, which prohibits "[g]atherings at public and nonpublic schools for the purpose of conducting in-person instruction, sports, and extracurricular activities serving pupils in grades 9 through 12."[1] Like all of the restrictions in DHHS's orders, this restriction is grounded in science and facts: 96 outbreaks have accrued in high schools, and early data indicates that high-school-aged children contract and spread the virus at greater rates than elementary-school children.

---

[1] Emergency Order Under Mich. Comp. Laws § 333.2253 – Gathering and Face Mask Order, dated December 7, 2020, https://www.michigan.gov/coronavirus/0,9753,7-406-98178_98455-546790--,00.html (Exhibit A).

Plaintiffs allege religious discrimination. Free exercise of religion—the lodestar of Plaintiffs' claims—is of doubtless import to this State and its residents. Indeed, the Director's Orders have consistently taken pains to make that clear, and to provide assurance to religious communities amidst this pandemic. (See, e.g., Exhibit A, 12/7 Order § 10(d) (exemption from penalty for religious worship).) But as courts have regularly recognized, not all government actions that may touch on religion in some manner or another amount to a constitutional violation. And here, Plaintiffs fail to acknowledge the obvious about the restriction they challenge—it impacts all high schools, whether public or private, secular or religious. This distinction is crucial to all of Plaintiffs' claims because the State is in no way discriminating against religious schools—the same restriction applies to all high schools. The general applicability of the restriction on high schools separates this case from the Supreme Court's recent holding in *Roman Catholic Diocese of Brooklyn v. Cuomo*, and, instead, places this case comfortably within what is permitted under settled First Amendment jurisprudence, including the Sixth Circuit analysis in *Commonwealth ex rel. Danville Christian Academy v. Beshear*.

The State recognizes that the restrictions are hard—COVID fatigue has set in and we all want things to return to 'normal.' But, as we all struggle through the worst of the virus, with a vaccine future on the horizon, we must remain vigilant and acknowledge that reasonable restrictions seeking to abate this virus are necessary for the time being.

Plaintiffs are not likely to succeed on their claims, nor do they carry their burden with respect to the other factors necessary to secure the extraordinary relief of a temporary restraining order. The Court should deny their motion.

# STATEMENT OF FACTS

## A. The nature of the COVID-19 pandemic

The facts surrounding the COVID-19 pandemic are well-established.  SARS-CoV-2 is similar to other coronaviruses (a large family of viruses that cause respiratory illnesses), but the strain is novel.  There is no general or natural immunity built up in the population (meaning everyone is susceptible), no widely available vaccine, and no known treatment to combat the virus itself (as opposed to treatment to mitigate its symptoms).

It is widely known and accepted that COVID-19, the disease resulting from the virus, is highly contagious, spreading easily from person to person via "respiratory droplets."[2]  Experts agree that being anywhere within six feet of an infected person puts an individual at a high risk of contracting the disease.[3]  Moreover, because many of those infected experience only mild symptoms, a person

---

[2] World Health Organization, *Modes of transmission of virus causing COVID-19: implications for IPC precaution recommendations* (March 29, 2020), https://www.who.int/news-room/commentaries/detail/modes-of-transmission-of-virus-causing-covid-19-implications-for-ipc-precaution-recommendations (Exhibit B).

[3] CDC, *Social Distancing, Keep a Safe Distance to Slow the Spread* (Nov. 17, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html  (Exhibit C).

could spread the disease before even perceiving sickness.[4]  Most alarmingly, a

person with COVID-19 might not yet be symptomatic, but still spread the disease.[5]

Because a vaccine for COVID-19 is not yet available to a meaningful

percentage of the population, the CDC recommends the best way to prevent illness

is to "avoid being exposed."[6]  Pursuant to this advice, governmental entities have

stressed the critical import of "social distancing," i.e., the practice of "keeping a safe

space between yourself and other people who are not from your household," ideally

at a distance of at least six feet.[7]

With this in mind, the CDC has explained that "[i]ndoor spaces are more

risky than outdoor spaces where it might be harder to keep people apart and there's

less ventilation."[8]  Indeed, studies show that "sharing indoor space is a major SARS-

CoV-2 infection risk."[9]  For example, one preliminary study showed that "[t]he odds

---

[4] CDC, *Evidence Supporting Transmission of Severe Acute Respiratory Syndrome Coronavirus 2 While Presymptomatic or Asymptomatic* (May 4, 2020), https://wwwnc.cdc.gov/eid/article/26/7/20-1595_article  (explaining that "[o]ne report suggested that up to 13% of infections may be transmitted during the presymptomatic period of illness") (Exhibit D).

[5] *Id.* (noting that "an increasing number of reports have indicated that some infected persons may not exhibit signs or symptoms of illness, including persons who are presymptomatic (SARS-CoV-2 RNA is detectable before symptom onset) or asymptomatic (SARS-CoV-2 RNA is detectable but symptoms never develop)").

[6] (Exhibit C).

[7] *Id.*

[8] CDC, *Deciding to Go Out* (Oct. 28, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/daily-life-coping/deciding-to-go-out.html (Exhibit E).

[9] Hua Qian, et al., *Indoor Transmission of SARS-CoV-2* (April 7, 2020), available at https://www.medrxiv.org/content/10.1101/2020.04.04.20053058v1.full.pdf (Exhibit F).

that a primary case transmitted COVID-19 in a closed environment was 18.7 times greater compared to an open air environment."[10]  Additionally, the *time* in which a person spends in one place seemingly affects the rate of transmission—the CDC noted that "spending *more time* with people who may be infected increases your risk of becoming infected" and infecting others.[11]  In short, the longer an individual spends in an indoor space with others, the higher the risk of infection for that individual.

With respect to schools, the CDC has explained that

SARS-CoV-2 transmission in schools may be a reflection of transmission in the surrounding community.  Therefore, when making decisions on when to open schools for in-person learning it is important to understand SARS-CoV-2 transmission within the surrounding community to determine the possible risk of introduction and transmission of SARS-CoV-2 within the school.[12]

Within K-12 education, according to the WHO, "[m]ore outbreaks [have been] reported in secondary/high schools than in primary/elementary schools."[13]  This is

---

[10] Hiroshi Nishiura, et al., *Closed Environments Facilitate Secondary Transmission of Coronavirus Disease 2019* (April 16, 2020), available at https://www.medrxiv.org/content/10.1101/2020.02.28.20029272v2  (Exhibit G); *see also* Lorenz G. Buonanno, et al., *Quantitative assessment of the risk of airborne transmission of SARS-CoV-2 infection:  Prospective and retrospective applications* (September 6, 2020), available at https://www.sciencedirect.com/science/article/pii/S0160412020320675?via%3Dihub (Exhibit H).

[11] (Exhibit C.)

[12] CDC, *Indicators for Dynamic School Decision-Making* (Sept. 15, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/indicators.html (Exhibit I).

[13] WHO, *What we know about COVID19 transmission in schools* (Oct. 21, 2020), https://www.who.int/docs/default-source/coronaviruse/risk-comms-updates/update39-covid-and-schools.pdf?sfvrsn=320db233_2 (Exhibit J); *see also*

likely because younger children (under the age of 10) seem to be less susceptible to infection.[14] CDC case counts reflect that, since March, twice as many adolescents, aged 12-17 years old, have tested positive for the virus compared to young children, aged 5-11 years old.[15]

In Michigan, as of December 3, 2020, there were at least 232 new or ongoing COVID-19 clusters or outbreaks attributed to K-12 schools alone.[16] In a ranking of "site type" and number of outbreaks, K-12 schools are second only to long-term care facilities, and they rank far higher than social gatherings, colleges, retail stores, and personal services businesses (e.g., nail/hair salon, spa, gym).[17] High schools

---

Jennifer R. Head, et al., *The effect of school closures and reopening strategies on COVID19 infection dynamics in the San Francisco Bay Area: a crosssectional survey and modeling analysis* (August 7, 2020) ("If susceptibility increases with age, as some evidence suggests, high school teachers may experience as much as 5-10 times more risk of symptomatic infection when compared with elementary school teachers, depending on the level of community transmission (moderate-high)."), available at https://www.medrxiv.org/content/10.1101/2020.08.06.20169797v1.full.pdf (Exhibit K.)

[14] DHHS, *Cases by age group* (Exhibit L.); *see also* E Goldstein, et al, *On the Effect of Age on the Transmission of SARS-CoV-2 in Households, Schools and the Community* (July 28, 2020), available at https://www.medrxiv.org/content/10.1101/2020.07.19.20157362v2.full.pdf (Exhibit M.)

[15] Rebecca T. Leeb, et al., *COVID-19 Trends Among School-Aged Children – United States*, March 1-September 19, 2020, CDC Morbidity and Mortality Weekly Report (Oct. 2, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6939e2-H.pdf (Exhibit N).

[16] DHHS, *Outbreak Reporting* (Dec. 3, 2020), https://www.michigan.gov/coronavirus/0,9753,7-406-98163_98173_102057---,00.html (Exhibit O).

[17] *Id.*

have contributed to more outbreaks than pre-schools, elementary schools, or middle schools.[18] And, within these outbreaks, high school outbreaks often contribute more cases per outbreak (ranging from 2 to 79), compared to elementary schools (1 to 17) or middle schools (1 to 16).[19]

## B. The State of Michigan's response to the COVID-19 pandemic

On March 10, 2020, in anticipation of the pandemic spreading in Michigan, Governor Whitmer declared a state of emergency and invoked the emergency powers available to the Governor under Michigan law.[20] Soon thereafter, DHHS's Director Robert Gordon began issuing emergency orders under Michigan's Public Health Code, Mich. Comp. Laws §§ 333.1101*, et. seq.* Beginning on March 23, 2020 and up through the present, Director Gordon has issued orders to protect the public health as the needs of the State required, including requirements regarding masks and distancing for gatherings and requirements regarding COVID-19 testing in certain contexts.[21]

On March 16, 2020, all K-12 schools in the state were closed via Executive Order 2020-5. Through subsequent executive orders K-12 schools were closed for

---

[18] DHHS, *K-12 school outbreaks, recent and ongoing, week ending Dec 3* (Exhibit P); *see also* DHHS, *School-Related Outbreak Reporting,* available at https://www.michigan.gov/coronavirus/0,9753,7-406-98163_98173_102480---,00.html (Exhibit Q).

[19] *See id.*

[20] All executive orders can be found at https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705---,00.html.

[21] All DHHS public health orders can be found at https://www.michigan.gov/coronavirus/0,9753,7-406-98178_98455-533660--,00.html.

the remainder of the 2019-2020 school year.  After a dip in cases over the summer months, schools across the state reopened for the 2020-2021 school year in the fall. Strict social distancing and masking requirements were imposed to limit the spread of the virus within schools.

Despite masking and gathering restrictions, Michigan's COVID-19 crisis worsened throughout October and into November.  As of November 15, 2020, complaints of coronavirus-like illness in emergency departments had increased for the ninth week in a row for the state, and hospitalizations for COVID-19 had doubled in less than two weeks, resulting in over 4.5 times the hospitalizations recorded on October 1, 2020.[22]  Between October 1 and November 15, Michigan's rate of positive test results had increased by 225% (despite only a 78% increase in administered tests), its per-capita case count had increased fivefold, and its death rate had increased fourfold.[23]

Accordingly, on November 15, 2020, in the face of such rapidly increasing COVID-19 infections and related hospitalizations in Michigan, Director Gordon issued the 11/15 Order.  The 11/15 Order contains a variety of restrictions on indoor

---

[22] Emergency Order Under Mich. Comp. Laws § 333.2253 – Gatherings and Face Mask Order, dated November 15, 2020, https://www.michigan.gov/coronavirus/0,9753,7-406-98178_98455-545136--,00.html (Exhibit R).

[23] *Id.*  The most up-to-date hospital capacity rates are available at https://www.michigan.gov/coronavirus/0,9753,7-406-98159-523641--,00.html and https://public.tableau.com/profile/mhapublic#!/vizhome/COVIDPublicDashboard/PleaseRead under the "Patient Census" tab.  Daily COVID-positive testing rates are available at https://www.michigan.gov/coronavirus/0,9753,7-406-98163_98173---,00.html, under the "Diagnostic Testing" tab.

gatherings to limit the spread of the virus. Relevant here, with limited exception, the Order prohibited "[g]atherings at public, nonpublic, and boarding schools for the purpose of conducting in-person instruction, sports, and extracurricular activities serving pupils in grades 9 through 12."[24] For grades pre-K through 8, the decision to return to remote learning was left to the determination of the local health departments and school districts.[25]

Subsequently, on December 7, 2020, Director Gordon issued an updated Emergency Order, which continues the restrictions relevant to this case set forth in the 11/15 Order until December 18, 2020. Like the November 15 Order, the December 7 Order prohibited gatherings for in-person instruction at all high schools.[26] As described in the preamble of the December 7 Order, COVID-19 hospitalization and test positivity rates have continued its surge in the State, necessitating the continuation of the temporary restrictions to further curb the ongoing public health crisis.[27] As of December 6, 2020, the seven-day COVID-positive testing rate in the State was 14%, and, as of December 8, 2020, the hospitalization rate stood at 74%.[28]

---

[24] 11/15 Order § 5(a).

[25] *Id.* § 5(b). Many local health departments or school districts had previously limited gatherings for in-person K-12 education.

[26] (Exhibit A.)

[27] (*Id.* at p. 2 (preamble).)

[28] As noted in Defendant's November 30, 2020 supplement that the Court previously requested (ECF No. 29), these figures are regularly updated at the following websites:

As noted in the press release accompanying the December 7 Order, reopening high schools is the Department's top priority.[29]

### C. Plaintiffs' Complaint and Motion for Temporary Restraining Order and Preliminary Injunction.

Plaintiffs—the Michigan Association of Non-Public Schools (MANS), three catholic high schools, and a group of parents—bring this action challenging the 12/7 Order. The Complaint contains eight counts, including multiple claims based on the Michigan Constitution.[30] (Compl., ECF No. 1.) Plaintiffs seek declaratory and injunctive relief, including an injunction "preventing the Defendant from enforcing the Order against Plaintiffs and MANS-member schools." (*Id.* at PageID.22.) Plaintiffs also seek damages, costs, expenses, and attorneys' fees. (*Id.*)

With their Complaint, Plaintiffs moved for a temporary restraining order to enjoin "Defendant and those under his authority from enforcing the [12/7] Order." (Pls.' Mtn., ECF No. 2, PageID.2.) Plaintiffs only raise two of their claims in the

---

- COVID-positive testing data: https://www.michigan.gov/coronavirus/0,9753,7-406-98163_98173---,00.html and https://www.mistartmap.info/,
- Hospitalization rates: https://www.michigan.gov/coronavirus/0,9753,7-406-98159-523641--,00.html.

[29] DHHS, Press Release, MDHHS extends epidemic order 12 days to ensure COVID-19 surge is stabilizing (Dec. 7, 2020) ("With improvements in those numbers in context, MDHHS will carefully reopen, with in-person learning at high schools first.") (Exhibit S.)

[30] Notably, Director Gordon is immune from the state-law claims under the Eleventh Amendment. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984); *McNeilus Truck & Mfg., Inc. v. Ohio ex rel. Montgomery*, 226 F.3d 429, 438 (6th Cir. 2000); *Freeman v. Michigan Dep't of State*, 808 F.2d 1174, 1179 (6th Cir. 1987). But Plaintiffs do not invoke those claims in their motion.

motion—(1) a free exercise claim alleging that the 12/7 Order violates their rights to practice their religion by closing the religious-affiliated high schools, and (2) a claim purportedly based on their rights as parents to make education decisions for their children. (*Id.* at PageID.194-206.)

For the reasons elaborated below, Plaintiffs' motion for a temporary restraining order should be denied.

## STANDARD OF REVIEW

In deciding whether to grant a temporary restraining order, a court weighs four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Bays v. City of Fairborn*, 668 F.3d 814, 818–19 (6th Cir. 2012). "When the government opposes the issuance of a temporary restraining order," however, "the final two factors — the balance of equities and the public interest — merge, because the government's interest is the public interest." *Perez-Perez v. Adducci*, 459 F. Supp. 3d 918 (E.D. Mich. 2020) (internal quotation and citation omitted).

Importantly, "[t]he party seeking the preliminary injunction bears the burden of justifying such relief, including showing irreparable harm and likelihood of success," and faces a "much more stringent [standard] than the proof required to survive a summary judgment motion" because a TRO is "an extraordinary remedy." *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012).

## ARGUMENT

**I.  Plaintiffs are not likely to succeed on the merits of their claims.**

Plaintiffs fail to state viable claims for relief for Counts I and V.  Regarding their First Amendment claim, the Director's Order does not violate the free exercise clause because it is neutral and generally applicable.  Indeed, the Order neither interferes with the practice of a religious organization nor targets religion in any way.  The Fourteenth Amendment right-to-direct-education claim suffers similar deficiencies.  In fact, while Plaintiffs allege a substantive due process claim under the Fourteenth Amendment, it—like Count I—is premised upon the free exercise clause.  Consequently, Count V is meritless for the same reasons as Count I.

**A.  Plaintiffs have not pled a viable claim under the First Amendment's Free Exercise Clause.**

Plaintiffs have failed to establish a strong likelihood of success on the merits of their claims.  To obtain relief, Plaintiffs need to show that the proscription on in-person learning at all high schools—including religious high schools—was inexplicably withheld from "comparable secular activities."  Plaintiffs cannot do this because the Director's decisions were motivated by characteristics inherent to high schools generally.  The order does not impose burdens on religious schools that it does not impose on other schools.  No favored "comparable secular activity" exists.  There is thus no dissimilar treatment here that could be of any constitutional concern.

1.     **The Order does not violate Plaintiffs' free exercise rights.**

The Free Exercise Clause of the First Amendment to the United States

Constitution applies to the States through the Fourteenth Amendment.  *Church of*

*the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993).  "The free

exercise of religion means, first and foremost, the right to believe and profess

whatever religious doctrine one desires." *Emp't Div., Dep't of Human Resources of*

*Oregon v. Smith*, 494 U.S. 872, 877 (1990) (overruled by statute (1993)).  "The Free

Exercise Clause protects religious observers against unequal treatment and

subjects to the strictest scrutiny laws that target the religious for special disabilities

based on their religious status." *Trinity Lutheran Church of Columbia, Inc. v.*

*Comer*, 137 S. Ct. 2012, 2019 (2017) (internal quotations omitted).

The Supreme Court has "long recognized a distinction between the freedom of

individual belief, which is absolute, and the freedom of individual conduct, which is

not." *Bowen v. Roy*, 476 U.S. 693, 699 (1986).  The Free Exercise Clause "cannot be

understood to require the Government to conduct its own internal affairs in ways

that comport with the religious beliefs of particular citizens." *Id.*  But the Clause is

implicated "if the law at issue discriminates against some or all religious beliefs or

regulates or prohibits conduct because it is undertaken for religious reasons." *City*

*of Hialeah*, 508 U.S. at 532; *see also Prater v. City of Burnside, Kentucky*, 289 F.3d

417, 427 (6th Cir. 2002) (holding that the Clause protects the right to engage in

conduct motivated by religious belief).

Thus, although laws that "target religious belief" or intentionally "infringe

upon or restrict practices because of their religious motivation" raise serious

constitutional concerns, "a law that is neutral and of general applicability need not be justified by a compelling government interest even if that law has the incidental effect of burdening a particular religious practice." *City of Hialeah*, 508 U.S. at 531, 533. In *Trinity Lutheran*, the Court noted that "[i]n recent years, when this Court has rejected free exercise challenges, the laws in question have been neutral and generally applicable without regard to religion." *Trinity Lutheran*, 137 S. Ct. at 2020. Indeed, neutral and generally applicable laws are presumed constitutional even when they encroach on an individual's fundamental constitutional rights. *Employment Division v. Smith*, 494 U.S. 872, 878–79 (1990); *New Doe Child #1 v. Congress of the United States*, 891 F.3d 578, 591–93 (6th Cir. 2018).

The Department's Order in this case is neutral and generally applicable. It applies to all schools—public and private, religious and secular. For that reason, it is presumptively constitutional. Plaintiffs allege no religious animus, nor do they allege that, within the unique context of schools, the law has the effect of targeting religious institutions.

        **2.      The fact that other, different activities are regulated differently does not render the in-person learning restrictions unconstitutional.**

Of course, the Sixth Circuit has acknowledged that, "[a]s a rule of thumb, the more exceptions to a prohibition, the less likely it will count as a generally applicable, non-discriminatory law." *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 614 (6th Cir. 2020) (quoting *Ward v. Polite*, 667 F.3d 727, 738 (6th Cir. 2012)). This is because "[a]t some point, an exception-ridden policy takes on the

appearance and reality of a system of individualized exemptions, the antithesis of a neutral and generally applicable policy." *Id.* (quoting *Ward*, 667 F.3d at 740). This is the sole reason that Plaintiffs insist that this Court should apply strict scrutiny to the Department's Order. (*See* Pls.' Br. at 12–19, ECF No. 6, PageID.196–203.)

But this line of argument misconstrues the meaning of an "exception," which is gauged by reference only to "comparable" activities. As set forth above and below, schools are in a class of their own. In any event, this argument is foreclosed by binding case law.

In particular, Plaintiffs cannot establish a strong likelihood of success on the merits in light of *Commonwealth ex rel. Danville Christian Academy v. Beshear*, No. 20-6341, ___ F.3d ___, 2020 WL 7017858 (6th Cir. Nov. 29, 2020). The factual background of that case is important. The plaintiffs were prompted to sue after the Governor of Kentucky issued an emergency order prohibiting in-person instruction at all public and private elementary and secondary schools. *Id.* at *1. (*See also* 11/18/20 Kentucky Order 2020-969.[31]) On the same day that order issued, the Governor of Kentucky also issued Order 2020-968, which imposed density limits on outdoor dining, indoor recreation facilities, indoor event spaces and theaters, and "[a]ll professional services and other office-based businesses." (*See* 11/18/20 Kentucky Order 2020-968, attached as Exhibit T.)

Both orders were added to a regulatory framework of existing public health restrictions touching all corners of Kentuckian life in ways that were calculated and

---

[31] This Order is attached to Plaintiffs' motion as Exhibit G. (PageID.290-91.)

specific to particular sectors of the economy. (*See* Kentucky Public Health, Healthy at Work Guidance and Requirement, available at https://govstatus.egov.com/ky-healthy-at-work (accessed Dec. 9, 2020).) These include—but are no means limited to—tattoo parlors (50% occupancy, not counting employees, Exhibit U); retail (50% occupancy plus distancing, Exhibit V); and massage businesses (50% occupancy, not counting employees, Exhibit W). Kentucky communicates its system of restrictions to its citizens as being part of the same fabric, listing their most important characteristics on the same single sheet of paper. (E.g., Kentucky Summary Graphic, Exhibit X (summarizing school closings, retail occupancy limits, and so on).)

Amid this landscape, the Sixth Circuit observed that the Kentucky Governor's order regarding in-person schooling "applies to all public and private elementary and secondary schools in the Commonwealth, religious or otherwise; it is therefore neutral and of general applicability and need not be justified by a compelling governmental interest." *Danville Christian*, 2020 WL 7017858, at *2. Accordingly, the plaintiffs could not establish a likelihood of success on the merits of their claim that restricting in-person instruction burdened their right to free exercise.

This Court should reach the same result. *Danville Christian* is binding, and the case for its result is even stronger here. Plaintiffs challenge a regulatory landscape that is functionally identical to that upheld in Kentucky. It is irrelevant that Kentucky's restriction on in-person learning appeared in a separate order. *See*

18

*City of Hialeah*, 508 U.S. at 540 ("For our purposes here, however, the four substantive ordinances may be treated as a group for neutrality purposes.").

In reaching its holding, the Sixth Circuit rejected the *Danville Christian* plaintiffs' identical appeal to the "exceptions" concept invoked in *Maryville Baptist* and *Ward*. (See *Danville*, Plaintiff's Brief at 3–4, No. 20-6341, Dkt. 22, attached as Exhibit Y (identifying Order 2020-968 and listing its restrictions on in-person activities other than schools).) Notwithstanding the plaintiffs' argument, the court observed that "the orders at issue in *Roberts v. Neace*, 958 F.3d 409 (6th Cir. 2020),] and *Maryville Baptist* excepted from their requirements airlines, funeral homes, liquor stores, and gun shops, again to name only a few. . . . No such comparable exceptions apply to Executive Order 2020-969." *Id.* at *3.

Thus, Plaintiffs' attempt to distinguish *Danville Christian* is not persuasive. As in Kentucky, Michigan's (more limited) school closures coexist with different, industry-specific regulations that were never intended to address the exact same risk criteria attendant to other facets of life. As *Danville Christian* recognized, thinking about these different restrictions as "exceptions" to the school closures does not make sense. The additional types of restrictions existed—but they were not "comparable exceptions [that] apply to Executive Order 2020-969." *Id.*

Indeed, Plaintiffs' own lawsuit highlights the unique facts that make a "school" a "school," ultimately justifying the Director's decision to impose neutral limits on in-person instruction in such settings. Schools use the benefits of community and fellowship to develop the mind, body, and spirit of young people—all

of which necessarily happens with such frequency and duration that it forms a defining part of nearly everyone's life.

Unfortunately, in the context of a pandemic, the short- and long-term closeness inherent to schools becomes a considerable public health risk. Thus, comparing a school to a tattoo parlor or a collegiate athletics program is an incoherent proposition. Other activities—even if they entail some measure of interaction or closeness—are not "exceptions" from a prohibition on in-person schooling. In addition to the reality that children in high school tend to interact with more individuals in a given day than the average adult, it is also relevant that, because children do not live alone, they necessarily return home to interact with another tier of their family—a fact less uniformly true of other segments of the population, such as a collegiate athlete or a working adult.[32]  (At this point, it bears repeating that the burden rests on Plaintiffs to prove otherwise; by simply equating an occasional, transitory visit to the salon with days, weeks, or months of full school days, they have not done so.)

Plaintiffs' further attempts to analogize high schools to other activities permitted under the Director's Order are unconvincing. (*See* Pls.' Br. at 17–18, ECF No. 6, PageID.201–202.) An in-person CPR class is both life-sustaining and, relative to a high school, has a short duration. Trade schools are permitted to hold in-person instruction, true—but Plaintiffs omit the fact that the order prohibits

---

[32] Head, *supra*, at 28 (Exhibit K) (explaining why characteristics particular to high schools make them susceptible to outbreaks).

such instruction to the extent that remote learning is feasible. The same omission curiously pops up when Plaintiffs note that high school students may come into school for career and technical education services. Again, only when it cannot be accomplished elsewise. As for carve-outs for English Language Learners and recipients of special education services, Plaintiffs concede that their operations utilize these provisions. (*Id.* at 17, PageID.201.) They therefore have no relevance to Plaintiffs' as-applied challenge.

In short, even if it is appropriate to consider these small carve-outs just because they bear a relationship to education, they are sharply limited to achieve narrow objectives that might be completely frustrated by an all-or-nothing ban. To the extent certain activities are permitted to continue, their participants surely do not consider the circumstances ideal. The Order achieves this same compromise with respect to Plaintiffs' religious practice by expressly exempting worship activities from enforcement. (Exhibit A, 12/7 Order § 10(d).)

The case law in this area uniformly confirms the true meaning of an "exception" that undermines a law's facial neutrality: Such exceptions can occur when "general bans that cover religious activity" exist alongside "exceptions for comparable secular activities." *Maryville Baptist*, 957 F.3d at 614 (emphasis added). (*See also* Pls.' Br. at 12, ECF No. 6, PageID.196 (acknowledging touchstone is existence of exception for "secular conduct posing similar or greater risks")).) Here, the "activity" in question is not merely existing outside of one's home, or even gathering with others. The activity in question is attending a high school.

Plaintiffs have not identified any activity both permitted by the Department's Order and comparable to the full-time, socially complex activity of attending high school; certainly, they have not shown that the order is "riddled with exemptions" for such types of activity. *Ward*, 667 F.3d at 738.

Plaintiffs rely on *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, in which a city passed a set of ordinances prohibiting sacrificial killings, but exempting a number of other slaughtering activities. But that case is immediately distinguishable because the record demonstrated an affirmative intent to craft pretextually neutral laws for the sole purpose of stopping the plaintiffs' religious practice. 508 U.S. at 534–35, 542. When the Court discussed the operation of the law, it did so because it supported a conclusion "that Santeria alone was the exclusive legislative concern." *Id.* at 536. Here, there is no such argument that Director Gordon acted with such religious animus; indeed, the Order's religious-worship exemption belies a suggestion to that effect. In any event, in *City of Hialeah*, the prohibited and permitted acts were the exact same, i.e., the killing of an animal. But the ordinances acted as a religious gerrymander; "few if any killings of animals [were] prohibited other than Santeria sacrifice." *Id.*; *see also id.* at 544–45. Here, the prohibited and permitted acts are not the same. They are not even comparable. To make them so, Plaintiff has distilled the concept of "comparable activities" to anything comprising "interaction with others."

In *Ward v. Polite*, a counseling student's religious beliefs interfered with her school's general policy that she should "affirm" a client's romantic relationships,

even if the relationship was inconsistent with her religious beliefs. *Ward*, 667 F.3d at 730–31. When the student was assigned a client seeking relationship counseling regarding their same-sex relationship, the student asked that a particular client be referred to a different counselor. *Id.* This request culminated with the school dismissing the student from the counseling program, citing violations of the governing code of ethics. *Id.* at 731–32. In fact, the code of ethics permitted the student's referral request. *See id.* at 735–36. In the alternative, however, the school alleged that it had a policy that superseded the code of ethics, i.e., no in practicum student was permitted to request a referral for any reason. *Id.* at 736. But the record revealed an instance "when the school permitted a practicum referral, allowing a grieving student to refrain from counseling a grieving client." *Id.* at 737. The school claimed this instance "was not a 'referral' but a 'single incident of non-assignment.'" *Id.* As to that excuse, the Sixth Circuit observed that the school was "permitting secular exemptions but not religious ones and failing to apply the policy in an even-handed, much less a faith-neutral, manner . . . ." *Id.* at 739.

*Ward*, then, confirms that whether a rule has an "exception" undermining its purported neutrality is closely tethered to the purported rule itself. In *Ward*, the anti-discrimination policy was used to justify the school's response to a faith-based objection, but the same policy—which was circumscribed to client referrals—was suspended for a secular purpose (the grieving student). For the reasons stated

above, a rule governing a salon is its own policy; it cannot be an "exception" to a policy that applies only to schools for reasons specific to schools.

*Maryville Baptist Church v. Beshear* relied on *Ward* and stands for the same general proposition. In that case, the Governor of Kentucky issued a COVID-19 emergency order prohibiting "all mass gatherings," "including, but not limited to, community, civic, public, leisure, faith-based, or sporting events." 957 F.3d at 611 (emphasis added). The order listed a number of exceptions, such as "normal operations at . . . shopping malls . . . and typical office environments," provided that patrons observe social-distancing guidelines. *Id.* No articulable principle explained why faith-based events were banned but other mass gatherings were not. *Id.* at 615. When Kentucky State Police took enforcement action against church congregants who attended a drive-in sermon from their cars, the church sued. *Id.* at 611–12.

In siding with the plaintiffs, the Sixth Circuit was swayed by how a broadly applicable prohibition on "mass gatherings"—which effectively eliminated all worship services—was "inexplicably applied to one group and exempted from another." *Id.* at 615; *see also id.* at 613 ("On the same Easter Sunday that police officers informed congregants they were violating criminal laws by sitting in their cars in a parking lot, hundreds of cars were parked in grocery store parking lots less than a mile from the church."). Notably, in its list of comparable activities where people "inexplicably" were permitted to gather—which included law firms, liquor stores, laundromats, gun shops, grocery stores, and interacting with a

deliverywoman—the court did not identify any everyday, all-day, socially complex activities comparable to a high school, or otherwise suggest that the school setting was meaningfully analogous to the listed ones. *See id.* at 614–15; *see also Roberts v. Neace*, 958 F.3d 409 (6th Cir. 2020) (extending *Maryville Baptist* from drive-up to in-person worship services).

*Maryville* is distinguishable because the restrictions, and exceptions thereto, related to the same type of activity: simple "mass gatherings," distinguished only by their purpose (and clumsily, at that). *Maryville Baptist*, 957 F.3d at 615 ("We doubt that the reason a group of people go to one place has anything to do with it."). Here, the activities themselves—not just their purpose—are different in kind, and therefore they are not "comparable." *Id.* at 614. If two activities might not be "comparable," the State need not treat them identically in its public-health determinations. Although it is not Director Gordon's burden to do so, he has articulated the basis for the distinction challenged in this case.

Finally, contrary to Plaintiffs' assertion, *Roman Catholic Diocese of Brooklyn*, too, is readily distinguishable. There, the Governor of New York imposed severe restrictions on religious services, in particular, while permitting looser or non-existent restrictions on nearby "essential" businesses, many of which plainly were not "essential." *Roman Catholic Diocese of Brooklyn v. Cuomo*, No. 20A87, 2020 WL 6948354, at *1 (U.S. Nov. 25, 2020).

Regardless, the Court concluded that the regulation was not neutral for two reasons, neither of which apply here. First, in some medium-risk areas, all

businesses of any type could admit however many people they wished, whereas worship was limited to 25 people.  *Id.* at *2.  As in *Maryville Baptist* and *Roberts*, the only distinguishing aspect of the activities was their purpose.  Not so here.  More important, the Governor of New York had admitted that "factories and schools have contributed to the spread of COVID-19" yet were "treated less harshly" than the religious community.  *Id.*  Here, Director Gordon has determined that high schools are a principal source of outbreaks,[33] and Plaintiffs have failed to carry their burden to disprove that premise.

There is one other important fact shared by all of these cases, and lacking here:  The invalidated governmental action precluded the plaintiffs' free exercise altogether.  The degree of the alleged burden is relevant.  *City of Hialeah*, 508 U.S. at 543 ("The underinclusion is substantial . . . .").  In *City of Hialeah*, the government banned an important ritual.  In *Ward*, it forced an individual to espouse views repugnant to her religious beliefs.  In *Maryville Baptist*, *Roberts*, and *Roman Catholic Diocese*, it banned religious worship, either outright or for the portion of a congregation that exceeded a small number of persons.  In other words, the burden imposed was substantial in each case.  Although the Department does not doubt the sincerity of Plaintiffs' desire for an integrated religious education, respectfully, the same burden is not present here.

---

[33] (Exhibit L; *see also* notes 14–16, *supra*.)

The Department's order expressly exempts religious worship from penalty.[34] Plaintiffs can continue to attend in-person worship services without fear of penalty. And, although perhaps it is not ideal, they can remotely conduct much of the remainder of the students' education. They claim that they "cannot 'instruct' students on the necessity of community and fellowship over a Zoom call." (Pls.' Br. at 11, ECF No. 6, PageID.195.) But, as the Sixth Circuit was fond of asking in *Maryville Baptist*: Why not? Certainly, the same burdens that afflict this sort of religious instruction also burden a secular school's attempt to teach its students the arts, or chemistry labs. Any extra burden resulting from Plaintiffs' decision to combine school with worship is similar in kind and categorically "incidental."

Again, this is not to discount the sincerity of Plaintiffs' frustration—a version of which is doubtless shared by nearly everyone who has endured the past several months. By now, we all know that a video chat has its downsides. But we also know that it is far better than nothing, such that Plaintiffs are not completely denied their ability to worship, in stark contrast to the plaintiffs in these other cases.

### 3. Plaintiffs' incomplete allegations of voluntary mitigation measures are immaterial.

Plaintiffs highlight their own alleged ability to implement safety precautions, delineating hundreds of thousands of dollars spent on things like thermal cameras. (*See, e.g.*, Compl. ¶¶ 53–58, ECF No. 1, PageID.10–12; Pls.' Br. at 4–6, ECF No. 6,

---

[34] (Exhibit A, 12/7 Order § 10(d).)

PageID.188–190.)  In that vein, one of their requested forms of relief asks for special treatment that would require the Department to individually evaluate "in-person religious schooling . . . on a case-by-case basis."  (Compl. at 22 (relief requested), ECF No. 1, PageID.22.)

As an initial matter, Plaintiffs' premises are suspect.  Plaintiff MANS' membership "includes over 400 Michigan schools, including 60 high schools." (Compl. ¶ 16, ECF No. 1, PageID.4.)  With 60 high schools to choose from, Plaintiff cherry-picks one school that has not suffered an identified case of COVID-19, highlighting that fact when it sues.  (Pls.' Br. at 20, ECF No. 6, PageID.204.) Another plaintiff school, Lansing Catholic High School, allegedly incurred 15 cases. (*Id.*)  Interestingly, Plaintiffs are silent regarding the record of the third plaintiff school, Gabriel Richard.  (*Id.*)  But even if that school's record was commendable, this Court has no information regarding Plaintiff MANS' overall track record with respect to the rest of its high schools.  To the extent these mitigation efforts are relevant, that kind of evidence is necessary to entertain Plaintiffs' request for a declaratory judgment aimed at all "MANS-member schools."  (Compl. at 22 (relief requested), ECF No. 1, PageID.22.)

In any event, certain Plaintiffs' initiatives—not to mention their financial resources—are legally irrelevant, and Plaintiffs offer no case law suggesting otherwise.  At best, Plaintiffs compare their track record to that of a collegiate athletics program.  (Pls.' Br. at 20, ECF No. 6, PageID.204.)  This comparison is shot through with statistical errors, which build on Plaintiffs' failure to offer a

useable number to evaluate their own 60 high schools' mitigation efforts. For example, the number of positive cases in the University of Michigan athletic department is meaningless without a denominator. (*Id.* at 15, PageID.199.)

Finally, by highlighting their own resources and status, Plaintiffs ask this Court for various forms of relief that apply only to religious schools. (E.g., Compl. at 22 (relief requested), ECF No. 1, PageID.22 (requesting "a declaration that in-person religious schooling must be determined on a case-by-case basis").) Despite their claim that the Department's Order is already crippled by exceptions, Plaintiffs seek to add another one, explicitly requesting a special class of rights for religious schools that would not be afforded to public schools. This Court should decline that invitation. The Order's restriction on in-person instruction at high schools is neutral and generally applicable, and any incidental burden this might impose on religion is not only of no constitutional concern, it is further alleviated by the Order's religious worship exemption. Plaintiffs have not shown a likelihood of success on this claim.

### B. Plaintiffs have not pled a viable claim under the Fourteenth Amendment.

Plaintiffs also argue that the Department's Order unconstitutionally infringes on their substantive due process right to control the education and upbringing of their children under the Fourteenth Amendment. (ECF No. 6, PageID.205–206.) However, Plaintiffs fail to offer any meaningful application of the law to this case.

At its core, this is a free-exercise claim. "Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.'" *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 394 (1989)); *see also Bell v. Johnson*, 308 F.3d 594, 610 (6th Cir. 2002) (holding that "the "shocks the conscience" test applied *only* to claims that could not be traced to an explicit constitutional guarantee"); *Johnson v. Lyon*, 406 F. Supp. 3d 651, (W.D. Mich. 2018) (holding that the plaintiffs' "Substantive Due Process claim merge[d] with their independent Second Amendment claim"). Accordingly, this claim is meritless for the same reason set forth *supra*: the public health order at issue is a neutral, generally applicable law that imposes only an incidental burden on Plaintiffs' religious rights. For that reason, rational-basis review applies. And the order passes that test with flying colors.

Plaintiffs' reference to the Fourteenth Amendment should not complicate things. Indeed, while Plaintiffs cite to *Wisconsin v. Yoder*, 406 U.S. 205 (1972), that case is distinguishable. There, members of the Old Order Amish religion and the Conservative Amish Mennonite Church were convicted under Wisconsin's compulsory school attendance law, which *required* school attendance until age 16. *Id*. at 205. In striking down the Wisconsin law as applied to compulsory education after the eighth grade, the Court noted that

> It is true that activities of individuals, even when religiously based, are
> often subject to regulation by the States in the exercise of their

> undoubted power to promote the health, safety, and general welfare, or
> the Federal Government in the exercise of its delegated powers.  [*Id.* at
> 220 (citations omitted).]

It reasoned, however, that "for Wisconsin to compel school attendance beyond the

eighth grade . . . it must appear either that the State does not deny the free exercise

of religious belief by its requirement, or that there is a state interest of sufficient

magnitude to override the interest claiming protection under the Free Exercise

Clause." *Id.* at 214.  Under the particular and distinguishable facts of that case,

this standard was not satisfied.

Here, for the reasons articulated in Section I.A, *supra*, the Department's

Order, unlike the law at issue in *Yoder*, easily meets this standard.  The Order

neither interferes with the practice of a religious belief—indeed, Plaintiffs, and the

students they educate and parent, are exempt from penalty for attending worship

services—nor does it target religion in any way.  *See Calvary Chapel*, 2020 WL

4251360, at *6 (Kavanaugh, J., dissenting) ("[A] State's closing or reopening plan

may subject religious organizations to the same limits as secular organizations.").

For example, in *Yoder*, the Court noted that "[t]he impact of the compulsory-

attendance law on respondents' practice of the Amish religion is not only severe, but

inescapable, for the Wisconsin law affirmatively compels them, under threat of

criminal sanction, to perform acts undeniably at odds with fundamental tenets of

their religious beliefs."  406 U.S. at 218.  Similar concerns are not apparent in the

instant case.  Rather, while Plaintiffs may desire in-person instruction, they have

not demonstrated any severe or inescapable impact of remote learning that is

"undeniably at odds with fundamental tenets of their religious beliefs"—especially

in light of the *temporary* restriction at issue. *Id.* There has been no showing that religious formation cannot be accomplished through remote means, and Plaintiffs cannot deny that the Director's Order does not penalize receipt of Catholic rites or in-person "forms of worship." (ECF No. 6, PageID.206.)

It also cannot be reasonably argued that the State does not have an interest of a sufficient magnitude to override Plaintiffs' interest in permitting in-person education for the next six days. *See Prince v. Massachusetts*, 321 U.S. 158, 166-67 (1945) ("The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death."). This is especially true in light of the recent and intense rise in COVID-19 cases and record deaths. Accordingly, even if the standard applied to the plaintiffs' claims in *Yoder* should be applied here, Plaintiffs' claim still fails to pass constitutional muster.

For these reasons, injunctive relief is not warranted.

**C.      *Jacobson* further prevents Plaintiffs from establishing a strong likelihood of success on the merits.**

To the extent there were somehow any doubt about the above conclusions, *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 29 (1905), removes it, making clear that Plaintiffs' claims cannot survive the unique historical context in which they arise and the exigent demands that attend it. As has long been recognized, state actors, when faced with "great danger[ ]," are permitted great latitude to secure the public health. *Id.* at 29; and courts must not "usurp the

functions of another branch of government" by second-guessing the executive's exercise of police power in such circumstances. *Id.* at 28-29; *see also, e.g.*, *League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, 814 F. App'x 125, 127 (6th Cir. 2020) (*LIFFT*) (citing *Jacobson* and stating, "[T]he police power retained by the states empowers state officials to address pandemics such as COVID-19 largely without interference from the courts.").

Thus, while the State's authority during this pandemic retains important limitations, *Jacobson* mandates that courts abstain from second-guessing exercises of police power in response to the pandemic unless there is "no real or substantial relation" between those actions and public health and safety, or the actions are "beyond all question, a plain palpable invasion of rights." *Jacobson*, 197 U.S. at 31.

*Jacobson*, and the deference it reflects to executive action in response to exigent and life-threatening circumstances, only confirms that Plaintiffs has not shown a likelihood of success on the merits of their claims. First, the Order's restriction on in-person instruction for high schools plainly has a "real or substantial relation" to protecting public health during this pandemic. *Jacobson*, 197 U.S. at 31. As the Sixth Circuit has explained, Plaintiffs carry a heavy burden of proving otherwise; "the relevant standard merely requires rational speculation that offers conceivable support to the [Director's] order," and it is "incumbent upon Plaintiffs to negate 'every conceivable basis which might support' it" under a rational basis review. *LIFFT*, 814 Fed. App'x at 128 (quoting *Armour v. City of Indianapolis*, 566 U.S. 673, 681 (2012)). "Under this test, [Director Gordon's] action

is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data"—"[e]specially so . . . in the case of a public health crisis like the one presented by COVID-19, where Michigan's latitude must be especially broad." *Id.* Furthermore, the restriction at issue "need not be the most effective or least restrictive measure possible to attempt to stem the spread of COVID-19." *Id.* at 129. As detailed *supra*, there is well beyond the requisite "rational speculation" that the temporary restriction on in-person instruction in high schools are important to mitigate the spread of COVID-19. Plaintiffs offer, and this is, no basis to conclude that the restriction has "*no* real or substantial relation" to that goal. *Jacobson*, 197 U.S. at 31.

Nor is the Director's Order "beyond all question, a plain, palpable invasion" of Plaintiffs' rights. *Id.* Plaintiffs do not allege—and cannot demonstrate—a fundamental right to a particular format of instruction. And even if they could, *Jacobson* is clear that its deferential standard of review applies to alleged infringements of "all rights," including those "secured by the fundamental law." *Id.* at 26, 31 (emphasis added). And for all the reasons discussed, Plaintiffs have not identified a violation of their First Amendment rights by the Order's temporary restriction on in-person instruction in high schools, let alone one that is, "beyond all question," "plain" and "palpable." *Id.* at 31.[35]

---

[35] *Jacobson* did not save the orders in *Maryville Baptist* and *Roman Catholic Diocese*—but that is because the orders in those cases failed to clear even *Jacobson's* deferential hurdle. They involved direct restrictions on free exercise at houses of worship that were deemed uniquely and inexplicably severe. *See Roman Catholic Diocese*, 2020 WL 6948354, at *3 ("[T]he State has not claimed that attendance at

Thus, because the Director's Order is a neutral and generally applicable response to a sweeping and deadly public health crisis, the existence of a rational basis for the order is sufficient to withstand constitutional scrutiny.

## II. Plaintiffs make an inadequate showing of irreparable harm.

Not only have Plaintiffs failed to show a likelihood of success on the merits of their claims, they also have failed to demonstrate that they will suffer irreparable injury without the requested preliminary injunction. *Tumblebus, Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005). As demonstrated in the preceding sections, Plaintiffs' constitutional rights are not being violated, and thus there is no constitutional violation to form the basis for the presumption of irreparable harm that can attach to constitutional injuries. *See Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002).

Furthermore, while Plaintiffs allege that they will be irreparably harmed by being required to provide remote instruction for the next six school days, this purported harm is specious at best. First, the Order at issue is temporary in nature—it expires on December 20, 2020—and practically affects Plaintiffs in an even more limited capacity. For example, Plaintiffs Lansing Catholic High School and Father Gabriel Richard High School will be required to conduct online learning for six days before their scheduled Christmas breaks begins on December 21,

---

the applicants' services has resulted in the spread of the disease. And the State has not shown that public health would be imperiled if less restrictive measures were imposed."); *Maryville Baptist*, 957 F.3d at 615 ("The Commonwealth has no good answers."). No such restriction is at issue here. No such

2020.[36]  And they have already demonstrated their ability to conduct online learning.  Plaintiff Lansing Catholic High School Fall 2020 Reopening Plan indicates that they would provide "remote learning support."[37]  It also provided that "all instruction [was] being conducted online from November 18 through December 8, 2020.[38]  Similarly, Plaintiff Father Gabriel Richard High School instituted an option for students to study at home for the 2020-2021 school year.[39]  And the Department has indicated that reopening high schools is the Department's top priority when the outbreak slows.  Accordingly, the Department's public health measure requires nothing more than what Plaintiffs have already implemented, and Plaintiffs will not be irreparably harmed.

Conversely, "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable

---

[36] Lansing Catholic High School, *Lansing Catholic High School Calendar*, https://calendar.google.com/calendar/u/0/embed?src=kda3o p36i7hcpph7i6tq4ih6d0@group.calendar.google.com&ctz=America/New_York&pli=1 (last accessed Dec. 9, 2020); Father Gabriel Richard, *School Calendar*, https://fgrhs.org/school-calendar/ (last accessed Dec. 9, 2020).

[37] *COVID Updates and Fall 2020 Reopening Plan*, https://docs.google.com/document/u/5/d/e/2PACX-1vQuyXl1guXhH8xcwYdSL_gw78jRln7Dtk857-xL1JP0A1byyJ1OLkG5b2CyRDirciYnIQXGftBvklQP/pub?bblinkid=236436839&bbemailid=23471683&bbejrid=1592601226 (last accessed Dec. 9, 2020).

[38] (*Id.*)

[39] Roadmap to Reopening 2020, https://fgrhs.org/wp-content/uploads/2020/09/roadmap-to-reopening-2020_revised-8.12.2020.pdf?80a043 (last accessed Dec. 9, 2020).  Plaintiff Everest Collegiate High School and Academy's calendar is not publicly accessible.

injury." *Maryland v. King*, 567 U.S. 1301 (2012) (quoting *New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977)).  These legal principles apply to the Department's order, which this Court must presume was duly authorized under applicable Michigan statutory law.  Pandemics are just the sort of fluid crisis that Michigan's public health code and public emergency laws were adopted to address. *See LIFFT*, 814 F. App'x at 129 ("Enjoining the actions of elected state officials, especially in a situation where an infectious disease can and has spread rapidly, causes irreparable harm.").

Here, an injunction would represent a deep, unwarranted intrusion into Michigan's sovereignty and its traditional police powers.  The intrusion will be costly on a public health level and from both federalism and separation of powers points of view.  Judicial tinkering in a public health crisis will have unintended consequences resulting in a patchwork of one-off carveouts for litigants who race to the courthouse while others accept and comply with the law.  The result will be more litigation, not less, as well as diminished public confidence in the pandemic response.

## III.    The remaining factors weigh in favor of Director Gordon.

The third and fourth injunction factors are similar—whether an injunction will cause substantial harm to third parties, and whether it would serve the public interest.  In regard to the fourth factor, the public interest "will not be as important as the other factors considered in the award of preliminary injunctive relief in actions involving only private interests, [but] it will be prominently considered in

actions implicating government policy or regulation, or other matters of public concern." 13 Moore's Federal Practice § 65.22 (Matthew Bender 3d. ed).

Here, issuing an injunction that precludes enforcement of the 12/7 Order as to religious-affiliated high schools would harm third parties and would not benefit the public. The 12/7 Order was put in place after careful consideration of the unique nature of the threat facing Michigan and the advice of scientific and medical experts, and in direct response to the rapidly increasing and life-threatening impact that COVID-19 has had in recent weeks. As set forth in the 12/7 Order, the seven-day average of 522.3 case per million people is "five times higher than it was on October 1."[40] There are more than 650 weekly deaths in Michigan, with a death rate of 9.1 deaths per million people.[41]

There is no reasonable dispute that the less time people gather in person, particularly for extended periods of time like students and staff do at high schools, the less the virus spreads.[42] Precluding the State from enforcing the December 7 Order by allowing religious high schools to return for in-person instruction will likely increase the spread of COVID-19, which not only affects those that contract the virus, but the entire health care system, including the health and welfare of

---

[40] (Exhibit A, 12/7 Order at p. 2 (preamble).)

[41] (*Id.*)

[42] (Exhibit J ("Regardless of what the indicators determine, the more students or staff who interact and the longer that interaction, the higher the risk of SARS-CoV-2 spread").)

those healthcare workers tasked with treating the sick and dying.[43]  It would also represent a deep, unwarranted intrusion into Michigan's sovereignty and its traditional police powers, which Director Gordon has duly exercised to protect the health and safety of this state and its residents during this deadly crisis.

The Court should also consider the implications for other cases if preliminary injunctive relief is granted.  The virus is resurgent, and other challenges to efforts to contain it are pending.

Simply put, and as the Sixth Circuit has aptly recognized, "[e]njoining the actions of elected state officials, especially in a situation where an infectious disease can and has spread rapidly, causes irreparable harm" to both the State and the public.  *LIFFT*, 814 F. App'x at 129.  The third and fourth factors favor Director Gordon and the millions of Michiganders he seeks to protect from a novel virus that is proving both debilitating and deadly, and they far outweigh any harm Plaintiffs may suffer from the Order's temporary restriction on in-person instruction for high schools.

---

[43] See Brief of Amicus Curiae Michigan Health & Hospital Association, No. 1:20-cv-01104, ECF No. 23.  In their amicus brief, the MHA emphasized the "spike in the number of cases and hospitalizations is already threatening the capacity of hospitals and ability of medical professionals to care for [COVID] patients.  The trend is even more troubling as the rapidly accelerating spread has the potential to become uncontrollable."  *Id.* at PageID.431.

## CONCLUSION AND RELIEF REQUESTED

Defendant respectfully request that the Court deny Plaintiffs' motion for a temporary restraining order and preliminary injunction and grant any other appropriate relief to Defendant.

Respectfully submitted,


*/s/ Neil Giovanatti*
Neil Giovanatti (P82305)
Daniel J. Ping (P81482)
Kyla L. Barranco (P81082)
Assistant Attorneys General
Attorneys for Defendant
P.O. Box 30736
Lansing, MI 48909
517-335-7632
giovanattin@michigan.gov
pingd@michigan.gov
barrancok@michigan.gov

Dated: December 10, 2020

**CERTIFICATE OF COMPLIANCE WITH LOCAL CIVIL RULE 7.2(b)(i)**

I certify that the above brief is 9,481 words in length including all headings,

footnotes, citations, and quotations.  This brief was created using Microsoft Word.

<div style="margin-left: 50%;">

*/s/ Neil Giovanatti*
Neil Giovanatti (P82305)
Daniel J. Ping (P81482)
Kyla L. Barranco (P81082)
Assistant Attorneys General
Attorneys for Defendant
P.O. Box 30736
Lansing, MI 48909
517-335-7632
giovanattin@michigan.gov
pingd@michigan.gov
barrancok@michigan.gov

</div>

Dated:  December 10, 2020

## CERTIFICATE OF SERVICE

I hereby certify that on December 10, 2020, I electronically filed the foregoing

document(s) with the Clerk of the Court using the ECF System, which will provide

electronic notices and copies to all counsels of record.

Respectfully submitted,

*/s/ Neil Giovanatti*
Neil Giovanatti (P82305)
Daniel J. Ping (P81482)
Kyla L. Barranco (P81082)
Assistant Attorneys General
Attorneys for Defendant
P.O. Box 30736
Lansing, MI 48909
517-335-7632
giovanattin@michigan.gov
pingd@michigan.gov
barrancok@michigan.gov