UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHIGAN ASSOCIATION OF NON-PUBLIC SCHOOLS,

EVEREST COLLEGIATE HIGH SCHOOL AND ACADEMY,

FATHER GABRIEL RICHARD HIGH SCHOOL,

LANSING CATHOLIC HIGH SCHOOL, and

CHRISTOPHER ABOOD, DONALD ENGLE, JENNIFER ENGLE, THERESA GRUBER, JAMES NORMAN, DAWN NORMAN, RICHARD POLJAN, WILLIAM ROSS, DEBORAH ROSS, ROBERT SCHWARTZ, and MICHELLE SCHWARTZ, on behalf of themselves and their minor children,

  Plaintiffs,

v.

ROBERT GORDON, in his official capacity as Director of the Michigan Department of Health and Human Services,

  Defendant.
_____/

Case No. 20-cv-01174

Hon. Paul L. Maloney

**REPLY BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

i

**TABLE OF CONTENTS**

INDEX OF AUTHORITIES ................................................................................................... ii
INTRODUCTION .................................................................................................................... 1
      A.    Defendant's application of the Free Exercise Clause is erroneous. ......................... 2
            1.    Plaintiffs have identified proper comparators. ............................................ 2
            2.    Plaintiffs' injuries are real and irreparable. ................................................. 7
      B.    The right to direct the education of children is not governed by *Smith*. ................ 9
      C.    *Jacobson v. Commonwealth of Massachusetts* is inapplicable. ............................ 10
      D.    Defendant has not carried and cannot carry his burden. ...................................... 11
CONCLUSION ...................................................................................................................... 12

# INDEX OF AUTHORITIES

**Cases**

*ACLU of Ky. v. McCreary Cty., Ky.*, 354 F.3d 438 (6th Cir. 2003) .............................................. 9

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) ............................................................ 8

*Castillo v. Whitmer*, 1:20-CV-751, 2020 WL 4810950 (W.D. Mich. Aug. 14, 2020) ................. 11

*Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520 (1993) .................................... 2, 8

*Du Jardine v. Michigan Dep't of Corr.*, No. 1:07-CV-701, 2008 WL 5411846 (W.D. Mich. Dec. 23, 2008) ................................................................................................................ 11

*Elrod v. Burns*, 427 U.S. 347 (1976) .............................................................................................. 9

*Employment Division v. Smith*, 494 U.S. 872 (1990) ................................................................ 9, 10

*Espinoza v. Montana Dept. of Revenue*, 140 S. Ct. 2246 (2020) .................................................... 2

*Hernandez v. C.I.R.*, 490 U.S. 680 (1989) .................................................................................... 11

*Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905) ....................................... 10, 11

*Jimdi, Inc. v. Twin Bay Docks and Products, Inc.*, 501 F. Supp. 2d 993 (W.D. Mich. 2007) ............................................................................................................................... 3

*Ky. ex rel. Danville Christian Acad., Inc. v. Beshear*, No. 20-6341, 2020 U.S. App. LEXIS 37413 (6th Cir. 2020) .................................................................................................. 6

*Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610 (6th Cir. 2020) ......................... 2, 4, 7, 8

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049 (2020) .................................... 1

*Pierce v. Society of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510 (1925) ........... 9

*Roman Catholic Diocese of Brooklyn v. Cuomo*, 20A87, 2020 WL 6948354 (U.S. Nov. 25, 2020) ....................................................................................................................... 11

*Roman Catholic Diocese v. Cuomo*, 208 L.Ed.2d 206 (U.S. 2020) ................................ 1, 4, 10, 11

*Scheurer Hosp. v. ADM Imaging Techs., Inc.*, 08-13035-BC, 2008 WL 3891398 (E.D. Mich. Aug. 21, 2008) .............................................................................................................. 3, 10

*Wisconsin v. Yoder*, 406 U.S. 205 (1972) ...................................................................................... 9

ii

Bodman_17338750_4

**INTRODUCTION**

Defendant's response is repugnant to the Constitution and threatens our free society. The government does not get to decide just how much religion is enough. *See* U.S. Const., amend. I; *cf.* Response Br., ECF No. 14, PageID 332-334 (arguing that there is no unjust burden on religion because religious persons are, by the grace of the government, still permitted to "attend in-person worship services without fear of penalty").  Nor can Defendant avoid the Constitutional infringement by blaming religious schools for combining religious instruction with secular education. *See id.* ("Any extra burden resulting from plaintiffs' decision to combine school with worship is similar in kind and categorically incidental."). Doing so ignores the very reason for the existence of these schools in the first place: propagation of the faith. *See Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2055 (2020) ("[R]eligious education and formation of students in the very reason for the existence of most private religious schools . . . .")

Defendant must answer for creating a regulatory regime that includes favored secular businesses but not religious high schools. *See generally Roman Catholic Diocese v. Cuomo*, 208 L.Ed.2d 206 (U.S. 2020).  Defendant must answer for creating a regulatory regime that allows for in-person school services for myriad in-person classroom instruction that includes everything from trade school to cosmetology school but does not include religious high schools.  It is insufficient to answer that such schooling is allowed because it "cannot be accomplished remotely," ECF No. 14, PageID.326, because that answer willfully ignores the unrebutted affidavits explaining that religious formation cannot be accomplished remotely either.  *See* ECF Nos. 1-2, 1-3, 1-4, 1-5.  Defendant has failed to answer and justify its total prohibition on in-person religious high school as it is required to do.  *See Roman Catholic Diocese*, 208 L.Ed.2d at 216 (Kavanaugh, J., concurring) ("[T]he State must justify imposing a 10-person or 25-person limit on houses of worship but not on the favored secular businesses."). Absent that justification, the regulatory

1

regime must be enjoined.

A.   **Defendant's application of the Free Exercise Clause is erroneous.**

Defendant claims that the Order does not violate Plaintiffs' rights under the Free Exercise Clause because (1) the Order is a generally applicable law that treats all high schools the same, and (2) Plaintiffs have not truly suffered an injury. Defendant is wrong on the law and wrong on the facts. As Defendant concedes, an "exception-ridden policy" is not generally applicable. *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 614 (6th Cir. 2020). The Order is precisely that, and Plaintiffs have and will suffer injury because of it.

1.   **Plaintiffs have identified proper comparators.**

According to Defendant, high schools are a category unto themselves, so any comparison with them is irrelevant. But that is not how a general-applicability analysis works. The Supreme Court established the proper framework in *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520 (1993). The first step is to look at the evil that the law seeks to remedy. *See id.* at 543 ("Respondent claims that [the various ordinances] advance two interests: protecting the public health and preventing cruelty to animals"). Next, look at the exceptions. *See id.* (recognizing exceptions for fishing, hunting, and extermination). Then, consider whether those exceptions are underinclusive in accomplishing the stated purpose of the law. *See id.* at 544 (recognizing that the ordinances were "underinclusive with regard to the city's interest in public health"). A law is not generally applicable when it includes numerous exceptions for secular activities that create the same alleged harm as the religious ones, but fails to extend those exceptions to the religious activity. *See Espinoza v. Montana Dept. of Revenue*, 140 S. Ct. 2246, 2261 (2020) (quoting *Lukumi*, 508 U.S. at 546) (recognizing that an asserted compelling interest is "fatally underinclusive" when the "proffered objectives are not pursued with respect to analogous nonreligious conduct").

There is no dispute that the evil to be remedied here is the spread of SARS-CoV-2 and COVID-19 through "gatherings." (ECF No. 1-11, PageID.122-123.) Defendant has sought to address the evil not through a generally applicable ban on all gatherings, but through a series of exceptions for specific activities. Defendant admits that "it is difficult to determine at this time whether the [November 15, 2020] order has sufficiently reduced the rate of spread." (*Id.*) As explained by the chairman of the infectious disease prevention department at a hospital here in Michigan, the virus is transmitted "through respiratory droplets or aerosol emitted through breathing, sneezing, talking, and similar actions." (Exhibit A, Affidavit of Dr. Arnold Markowitz, ¶ 11.)[1] Duration matters, but only to a point:

> The longer a person who is infected with the virus is in close proximity to someone else, the greater the chance that the virus will be transmitted, but **the risk of transmission is not meaningfully higher after fifteen minutes**. This means, for example, that if two persons are conversing in person for twenty minutes, and all other factors being equal, the risk of transmission is not meaningfully higher if they conversed for two hours.

(*Id.*, ¶ 13 (emphasis added).)

In light of that scientific reality, the Order's prohibition on in-person religious formation, while permitting countless secular activities of comparable risk, makes little sense. Take businesses. People may gather inside for extended periods in airports, exercise facilities, shopping malls, or public pools[2]; with employees and customers at retail and other establishing[3]; at allowed

---

[1] A court can properly consider an affidavit filed with a reply brief on a motion for preliminary injunction and temporary restraining order. *See, e.g., Jimdi, Inc. v. Twin Bay Docks and Products, Inc.*, 501 F. Supp. 2d 993, 1007 (W.D. Mich. 2007); *Scheurer Hosp. v. ADM Imaging Techs., Inc.*, 08-13035-BC, 2008 WL 3891398, at *4 (E.D. Mich. Aug. 21, 2008).

[2] Emergency Order, ECF No. 1-11, at ¶ 2(c)(2)).

[3] *Id.* at ¶ 2(c)(3).

workplace gatherings[4]; on a school bus or other public transit[5]; at proctored nationally-administered admissions and certification examinations[6]; retail stores, libraries, or museums[7]; in socially distanced waiting rooms of practically any business[8]; indoor ice rinks with capacity restrictions[9]; hair, nail, tanning, massage, traditional spa, tattoo, body art, piercing services, and similar services if masks are worn[10]; and in NCAA and professional locker, film, and team rooms.[11]

Defendant's defense to this blatant disparity is that high schools are *different*, but it is hard to see how.  Each activity brings people in close proximity to others, which carries with it an attendant risk that the virus could be transmitted.  (Exhibit A, ¶¶ 11–14, 30–32.)  That is why the Supreme Court deemed "acupuncture facilities, camp grounds, garages, . . . plants manufacturing chemicals and microelectronics and all transportation facilities" to be relevant comparators to house of worship.  *Roman Catholic Diocese*, 208 L.Ed.2d at 208.  And why the court in *Maryville Baptist* compared houses of worship to "law firms, laundromats, liquor stores, and gun shops." *Maryville Baptist Church, Inc.*, 957 F.3d at 614.  In Dr. Markowitz's expert opinion, transmission of the virus is substantially less likely to occur at Plaintiffs' schools than through a substantial majority of these and other activities.  (Exhibit A, ¶ 30.)

Defendant asserts that students are in school longer than at "an occasional, transitory visit to the salon . . . ." (ECF No. 14, PageID.326.)  But that ignores the science that higher risks are

---

[4] *Id.* at ¶ 2(c)(4).

[5] *Id.* at ¶ 2(c)(9).

[6] *Id.* at ¶ 2(c)(14).

[7] *Id.* at ¶ 4(a).

[8] *Id.* at ¶ 4(c).

[9] *Id.* at ¶ 4(d).

[10] *Id.* at ¶ 4(f).

[11] *Id.* at ¶ 6.

onset at fifteen minutes of exposure, even if broken up into increments.[12]  It also ignores the stylist who works at that salon, chatting with customer after customer for eight hours or more, and necessarily within six feet.  Defendant speculates that high schools pose an especially high risk "because children do not live alone, they necessarily return home to interact with another tier of their family—a fact less uniformly true of other segments of the population, such as a collegiate athlete or a working adult." (*Id.*)  Defendant's speculation and conjecture might be enough for rational basis review, but not strict scrutiny.  And it goes without saying that households vary widely, many college students live at home, and under Defendant's order, those same children kept home from school are still free to attend their swim lessons and tutoring before rejoining their variously sized families.  (ECF No. 1-11, ¶¶ 2(c)(12), 5(c).)

Defendant's attempts to wave off comparisons to other forms of education fall flat, too. In-person CPR classes are distinguishable from high schools, says Defendant, because "relative to a high school" these are of short duration.  But beyond 15 minutes of exposure, the risk is the same. (*See* Exhibit A, ¶ 13.)  And surely attendance at a boarding school is not a fleeting encounter. (ECF No. 1-11, ¶ 5(d).)  Most glaring of all is the fact that gathering is permissible at some of the very same schools now shuttered if the aim is "tutoring and academic support," or for "career and technical education services." (*Id.*)  In-person special education and English language services are also available. (*Id.*, ¶ 5(a).)  Defendant makes no attempt whatsoever to demonstrate that these somehow pose a lesser risk than Plaintiffs' schools—because they do not. (*See* Exhibit A, ¶ 32.) Instead, Defendant merely insists that these exceptions are irrelevant because they only apply if the activities must be done in person and "cannot be accomplished elsewise."  (ECF No. 14,

---

[12] *See Definition of "Close Contact,"* Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/php/contact-tracing/contact-tracing-plan/appendix.html (updated Oct. 21, 2020); *see also* Exhibit A, ¶ 13.

PageID.326-327.)  That is *precisely* what Plaintiffs have pleaded in this case and established through their affidavits: religious formation cannot be accomplished remotely.  (ECF Nos. 1-2, 1-3, 1-4, 1-5.)  And despite Defendant's baseless claim that Plaintiffs have proffered no evidence that religious formation cannot be accomplished remotely, Plaintiffs' affidavits show exactly that.

Defendant makes much of the Sixth Circuit's order on a motion to stay in *Ky. ex rel. Danville Christian Acad., Inc. v. Beshear*, No. 20-6341, 2020 U.S. App. LEXIS 37413 (6th Cir. 2020), but that decision does not say what Defendant claims it does.  Defendant goes to great lengths to explain that there were two executive orders in issue in that case, one of which had many exceptions in it.  But the Sixth Circuit did not consider any other orders, did not mention them, and explicitly considered only the school order.  *See id.* at *7 ("No such comparable exceptions apply to Executive Order 2020-969.").  The entire premise of the Sixth Circuit's holding was that there were not numerous exceptions.  *Id.*  Even if one were to look only at the school restrictions in that case and the school restrictions in this one, the differences are stark.  The Kentucky order's only exceptions were for "private schools conducted in a home solely for members of that household" and "small group in-person targeted services."  (ECF No. 6-8, PageID.291.)  Defendant's Order exempts K-8 schools, career, technical, vocational, special education, tutoring, and English language services, among others.

When all else fails, Defendant turns to statistics, but those too are unavailing.  Defendant quotes a World Health Organization document for the proposition that "more outbreaks have been reported in secondary/high schools than in primary/elementary schools."  (ECF No. 14, PageID.312 (alterations adopted).)  But *that very same document* states, "[e]arly modelling studies suggested that closing schools reduced community transmission less than other social distancing

6

interventions." (ECF 14-1, PageID.433.)[13]  Elsewhere, Defendant cites the State's own data and claims that the K-12 schools combined—a curious dataset given that only high schools are closed—rank "second" in outbreaks. (ECF 14, PageID.313.)  Yet the very data cited by the State in support of its argument comes with a disclaimer that because of significant underreporting problems, the "rankings" do "not provide a complete picture of outbreaks in Michigan and **the absence of identified outbreaks in a particular setting in no way provides evidence that, in fact, that setting is not having outbreaks**." (ECF No. 14-16, PageID.489 (emphasis added).)  In other words, outbreaks may be occurring at trade schools, salons, or the local big box stores, but unlike Plaintiffs' schools, they do not meticulously track and report them. (*See* Exhibit A, ¶ 34.)

Under *Lukumi* and *Roman Catholic Diocese*, the Court must look to the evil to be remedied and the exemptions that Defendant deems consistent with addressing it.  Here, that means mitigating the spread of the virus, which is transmitted more easily in indoor environments. Defendant can provide no answer why learning a trade or receiving special education or tutoring can be done safely, but religious instruction with the exact same or more stringent safety protocols cannot.  *Cf. Maryville Baptist Church*, 957 F.3d at 613 ("How are in-person meetings with social distancing any different from drive-in church services with social distancing?")  From a scientific perspective, there is no basis for a distinction. (Exhibit A, ¶¶ 30, 32.)  These and other activities are proper comparators, dispelling any notion that the Order is one of general applicability.

    **2.**    **Plaintiffs' injuries are real and irreparable.**

*You can still go to church on Sunday.*  That, it seems, is Defendant's response to Plaintiffs' thorough affidavits explaining why remote learning is not an adequate substitute for religious

---

[13] It also states that "[c]losure of schools should be considered only if there is no other alternative." (ECF No. 14-11, PageID.439.)

formation.[14] (*See* ECF No. 14, PageID.333.) ("Plaintiffs can continue to attend in-person worship services without fear of penalty. And, although perhaps it is not ideal, they can remotely conduct much of the remainder of the students' education.") But of course, determining whether Zoom calls are an adequate substitute for religious practice is not in Defendant's bailiwick. *See Maryville Baptist Church*, 957 F.3d at 615 (6th Cir. 2020) ("[W]ho is to say that . . . every member of the congregation must see [Zoom calls] as an adequate substitute for what it means when 'two or three gather in my Name.'"); *see also Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 725 (2014) ("[I]t is not for us to say that [claimants'] religious beliefs are mistaken or insubstantial.")

Likewise, Defendant claims—"respectfully," of course—that Plaintiffs do not face "the same burden" as those who are not permitted to attend a Sunday service. (ECF No. 14, PageID 332.) How Defendant has made this religious assessment is unclear. The Santeria practitioners in *Lukumi* could still pray, even if they had to forego animal sacrifices. The Orthodox Jews in *Roman Catholic Diocese* could still observe Shabbos at home. And nothing stopped the Christian parishioners in *Maryville Baptist* and *Roberts* from holding family Bible studies in their backyards. But in those cases and here, religious persons were inhibited from practicing something they sincerely believed was an essential part of their faith. Whether Defendant deems that burden substantial is immaterial.[15]

And despite what Defendant claims, the fact that the Order is currently set to expire on December 20, 2020 does not make the harm any less real or irreparable. (ECF No. 14,

---

[14] In fairness, perhaps Defendant has not yet had the chance to read them. That would explain his baffling assertion that "[t]here has been no showing that religious formation cannot be accomplished through remote means . . . ." (ECF No. 14, PageID.338.)

[15] Defendant's citation to *Lukumi* is also misplaced. (ECF No. 14, PageID.32.) When the Court stated that "the underinclusion is substantial," it was referring to the fact that the challenged ordinances were underinclusive of the harm they were purportedly meant to address. *Lukumi*, 508 U.S. at 543.

PageID.341.)  To begin, Plaintiffs can be forgiven for doubting that this is the last time they will be shut down.  At the press conference announcing the Order, state officials so much as declared that the 12-day order would be extended.  In March, a three-week closure turned into a lost school year.  (ECF Nos. 1-7, 1-8.)  School resumed, but before Thanksgiving, Defendant abruptly ended Plaintiffs' in-person instruction, again with a stated expiration date.  (ECF No. 1-10.)  Then, with less than 48-hours' notice, Defendant extended the shutdown.  (ECF No. 1-11.)  By Defendant's logic, it will always be "specious" for religious persons to assert their rights so long as the Orders are broken up into short durations.  (ECF 14, PageID.341.)  At any rate, "when reviewing a motion for a preliminary injunction, if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *ACLU of Ky. v. McCreary Cty., Ky.*, 354 F.3d 438, 445 (6th Cir. 2003) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373.  Plaintiffs' irreparable injury from Defendant's most recent order began on December 9, 2020, and it will continue until Plaintiffs' schools can once again join together in person.

**B.      The right to direct the education of children is not governed by *Smith*.**

Even if the court were to conclude that the Order is "generally applicable," Plaintiffs are still likely to succeed on the merits.  Plaintiffs' rights to direct "the religious upbringing and education of their children," *Wisconsin v. Yoder*, 406 U.S. 205, 313-214 (1972), is separate and distinct from the general rule of *Employment Division v. Smith*, 494 U.S. 872 (1990).  A law that burdens this right is subject to strict scrutiny irrespective of whether the law is neutral and generally applicable.  *See e.g.*, *Pierce v. Society of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510 (1925) (holding a law that outlawed private religious education in the state unconstitutional). *Smith* did not change *Yoder*.  In fact, *Smith* specifically acknowledged that *Yoder* concerned a

9

different right and mode of analysis. *Yoder* (and other cases) concerned neutral and generally applicable laws governing religiously motivated conduct that were invalidated based on the "Free Exercise Clause in conjunction with other constitutional protections" such as the right to "direct the education of [] children." *Smith*, 494 U.S. at 881-882. The Court in *Smith* acknowledged that the case before the Court did not "present a hybrid situation, but a free exercise claim unconnected with any communicative activities." *Id.* at 882.

Defendant has made no effort to argue that the Order satisfies strict scrutiny because it plainly cannot. And Plaintiffs' affidavits thoroughly establish that the ban on in-person schooling inhibits their ability to direct the religious education of their children. (ECF No. 1-2.) Consequently, even if the Court concluded that teaching English or providing special education or other career and technical training to a ninth grader is not comparable to teaching that same ninth grader how to live a life of virtue, Plaintiffs are still likely to succeed on their claims relating to directing the religious education of their children.

**C.      *Jacobson v. Commonwealth of Massachusetts* is inapplicable.**

Defendant also appeals—as so many others have of late—to *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 29 (1905). According to Defendant, *Jacobson* stands for the proposition that courts must be especially deferential to government actors' exercise of their police powers in addressing a pandemic. (ECF No. 14, PageID.338-339.) But as Justice Gorsuch recently explained, "*Jacobson* didn't seek to depart from normal legal rules during a pandemic, and it supplies no precedent for doing so. Instead, *Jacobson* applied what would become the traditional legal test associated with the right at issue[.]" *Roman Catholic Diocese v. Cuomo*, 208 L.Ed.2d at 213 (Gorsuch, J., concurring). Based on the right asserted in *Jacobson*, the relevant legal test was effectively rational basis review. *Id.* The challenged law in *Jacobson* "survived only because it did not 'contravene the Constitution of the United States' or 'infringe any right granted or secured

by that instrument.'" *Id.* (quoting *Jacobson*, 197 U.S. at 25).

Here, the Order violates a textually explicit right: the right to freely exercise one's religion. U.S. Const. amend I. As already explained, its lack of general applicability means it must satisfy strict scrutiny—pandemic or not. "[J]udicial deference in an emergency or a crisis does not mean wholesale judicial abdication, especially when important questions of religious discrimination, racial discrimination, free speech, or the like are raised." *Roman Catholic Diocese*, 208 L.Ed.2d at 206 (Kavanaugh, J., concurring).

**D.     Defendant has not carried and cannot carry his burden.**

Defendant correctly notes that "the party seeking the preliminary injunction bears the burden of justifying such relief, including showing irreparable harm and likelihood of success, and faces a much more stringent standard than the proof required to survive a summary judgment motion because a TRO is an extraordinary remedy." (ECF No. 14, PageID.319 (alterations adopted).) What Defendant fails to acknowledge, however, is that "[o]nce a plaintiff has established that his religious exercise has been substantially burdened, the onus shifts to the government[.]" *Du Jardine v. Michigan Dep't of Corr.*, No. 1:07-CV-701, 2008 WL 5411846, at *1 (W.D. Mich. Dec. 23, 2008). At that point, the government must show a "sufficient justification for the discrimination" under strict scrutiny. *Roman Catholic Diocese of Brooklyn v. Cuomo*, 20A87, 2020 WL 6948354, at *8 (U.S. Nov. 25, 2020) (Kavanaugh, J., concurring). *See also Hernandez v. C.I.R.*, 490 U.S. 680, 699 (1989) ("The free exercise inquiry asks whether government has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the burden."); *Castillo v. Whitmer*, 1:20-CV-751, 2020 WL 4810950, at *2 (W.D. Mich. Aug. 14, 2020) ("To restrict our enumerated liberties, such as the free exercise of religion found in the First Amendment, the government must justify its decision with a compelling interest and its actions must be narrowly

11

tailored to advance that interest.").

Accordingly, because Plaintiffs have proven that their religious exercise has been substantially burdened by the Order, the onus shifts to Defendant to show that the burden on religion is justified by a compelling interest and that the Order is narrowly tailored to advance that interest. Defendant makes no attempt to show why a blanket ban on religious high schools constitutes narrow tailoring and thus fails to carry his burden.

## CONCLUSION

This case is simple. Plaintiffs stand ready and able to follow the same safety measures as countless industries. They will use masks, they will socially distance, they will enforce reasonable capacity limits, and they will comply with reporting requirements. In short, they will do whatever it takes to meet in person because doing so is a critical component to the practice of their faith. Defendant has seen fit to allow football teams and cosmetology schools to meet in person, yet he refuses to permit religious high schools to reopen. The Constitution does not permit Defendant's judgment calls, and his response brief gives no reason to think otherwise. Enforcement of the Order must be enjoined.

Respectfully submitted,

BODMAN PLC

By: /s/Thomas J. Rheaume Jr.
Thomas J. Rheaume Jr. (P74422)
Gordon J. Kangas (P80773)
6th Floor at Ford Field
1901 St. Antoine Street
Detroit, Michigan 48226
313-259-7777
trheaume@bodmanlaw.com
gkangas@bodmanlaw.com

December 12, 2020                                   Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| MICHIGAN ASSOCIATION OF NON-PUBLIC SCHOOLS, | Case No. 20-cv-01174 |
| EVEREST COLLEGIATE HIGH SCHOOL AND ACADEMY, | |
| FATHER GABRIEL RICHARD HIGH SCHOOL, | |
| LANSING CATHOLIC HIGH SCHOOL, and | |
| CHRISTOPHER ABOOD, DONALD ENGLE, JENNIFER ENGLE, THERESA GRUBER, JAMES NORMAN, DAWN NORMAN, RICHARD POLJAN, WILLIAM ROSS, DEBORAH ROSS, ROBERT SCHWARTZ, and MICHELLE SCHWARTZ, on behalf of themselves and their minor children, | |
| Plaintiffs, | |
| v. | |
| ROBERT GORDON, in his official capacity as Director of the Michigan Department of Health and Human Services, | |
| Defendant. | |
| _____/ | |

## CERTIFICATE OF SERVICE

I hereby certify that on December 12, 2020, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to all counsel of record.

                                                               */s/Thomas J. Rheaume, Jr.*
                                                               Thomas J. Rheaume, Jr. (P74422)

## CERTIFICATE OF COMPLIANCE

This document complies with the type volume limits of W.D. Mich. LCivR 7.3(b)(i) because, excluding the parts of the document exempted by W.D. Mich. LCivR 7.3(b)(i), this document contains 3,806 words.

This document complies with the requirements of W.D. Mich. LCivR 10.1 because it was prepared in a proportionally spaced typeface using Microsoft Word in 12-point Times New Roman font.

*/s/Thomas J. Rheaume, Jr.*
Thomas J. Rheaume, Jr. (P74422)
